George RICH, Jr., Derivatively on Behalf of FUQI INTERNATIONAL, INC., Plaintiff,

v.

YU KWAI CHONG, Ching Wan Wong, Lie Xi Zhuang, Lily Lee Chen, Eileen B. Brody, Victor A. Hollander, and Jeff Haiyong Liu, Defendants,

and

Fuqi International, Inc., Nominal Defendant.

Civil Action No. 7616–VCG.

Court of Chancery of Delaware.

Submitted: Feb. 11, 2013.
Decided: April 25, 2013.

. Paul A. Fioravanti, Jr. and Tanya E. Pino, of Prickett, Jones & Elliot, P.A., Wilmington, De; of Counsel: Eric L. Zagar, Robin Winchester, and Justin O. Reliford, of Kessler Topaz Meltzer & Check, LLP, Attorneys for Plaintiff.

John L. Reed and Scott Czerwonka, of DLA Piper LLP, Wilmington, DE; OF COUNSEL: Robert Brownlie and Jennifer A. Lloyd, of DLA Piper LLC, Attorneys for Defendants and Nominal Defendant.

### OPINION

GLASSCOCK, Vice Chancellor.

## I. OVERVIEW

The Plaintiff here, a stockholder, made a demand to the Defendant corporation, asking the corporation to prosecute claims against its officers and directors for violating their *Caremark* duties. The individual Defendants not only failed to respond to the demand over the next two years, but allegedly took actions making a meaningful response to the demand unlikely if not impossible. Under these facts, the Plaintiff may pursue an action on behalf of the

corporation derivatively, notwithstanding Court of Chancery Rule 23.1.

\* \* \*

This Opinion concerns a motion brought by Defendant Fuqi International, Inc. and its directors to dismiss a derivative complaint alleging breaches of fiduciary duty. Fuqi, a Delaware entity whose sole asset is stock of a Chinese jewelry company, completed a public offering in the United States in 2009. In March 2010, Fuqi announced the need for restatement of its 2009 financial statements. Following this announcement, Fuqi disclosed additional problems it had, including the transfer of $120 million of cash out of the company to third parties in China. In July 2010, Plaintiff George Rich, Jr., a Fuqi stockholder, made a demand to the board of directors to remedy breaches of fiduciary duty and weaknesses in Fuqi's internal controls. Fuqi's Audit Committee commenced an investigation, which was abandoned in January 2012 upon management's failure to pay the fees of the Audit Committee's advisors. Fuqi's independent directors have since resigned.[1]

Plaintiff Rich brought this action in June 2012, alleging breaches of fiduciary duty under *Caremark.* Now, the Defendants have moved to dismiss the Complaint under Rule 23.1, because the Fuqi board has not yet rejected the Plaintiff's demand. Having found that the Plaintiff has pled particularized facts that raise a reasonable doubt that the directors acted in good faith in response to the demand, I deny the Rule 23.1 Motion. Second, Fuqi moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Notwithstanding the well-known difficulty of prevailing on a *Caremark* claim, the Plaintiff has pled facts that, assumed true, lead me to reasonably infer that the Fuqi directors knew that its internal controls were deficient, yet failed to act. Therefore, I deny the Motion to Dismiss under Rule 12(b)(6). Finally, the Defendant has moved to dismiss or stay this case under the *McWane* doctrine, in favor of several prior-filed cases in New York. I deny that Motion as well, because I doubt that courts sitting in New York have personal jurisdiction over the Defendants.

In summary, the Defendants' Motion to Dismiss or Stay this case is denied.

## II. BACKGROUND FACTS

### A. Parties

Plaintiff George Rich, Jr. is, and at all relevant times has been, a stockholder of Fuqi International, Inc. ("Fuqi").[2] Nominal Defendant Fuqi is a Delaware corporation whose principle offices are located in the People's Republic of China.[3] Fuqi is engaged in selling high quality, precious metal jewelry.[4] Fuqi shares were traded on the NASDAQ until they were delisted in March of 2011[5] and now trade on the pink sheet market for approximately $1 per share.[6]

Defendant Yu Kwai Chong ("Chong") is the principal founder of Fuqi and has served as Chairman of the Board since Fuqi's inception.[7] Chong also served as Fuqi's CEO from April 2011 until June

---

1. One formerly independent director is currently serving as Fuqi's CEO.

2. Compl. ¶¶ 11, 61, June 13, 2012.

3. *Id.* ¶ 1.

4. *Id.* ¶ 2.

5. *Id.* ¶ 9.

6. *Id.* ¶ 2.

7. *Id.* ¶ 13.

2011.[8] Defendant Lie Xi Zhuang ("Zhuang") has served as Fuqi's COO since April 2001 and as a director since 2008.[9] Defendant Ching Wan Wong ("Wong") served as Fuqi's CFO from January 2004 until his resignation in July 2011; Wong also served as a Fuqi director from 2008 until he resigned in June 2011.[10] Defendant Lily Lee Chen ("Chen") served as a Fuqi director from June 2007 until her resignation in March 2012.[11] Defendants Eileen B. Brody ("Brody") and Victor A. Hollander ("Hollander") served as Fuqi directors, and as members of the Audit Committee, from June 2007 until their resignations in January 2012.[12] Defendant Jeff Haiyong Liu ("Liu") has served as a director of Fuqi from June 2007 to the present, and has also served as a member of the Audit Committee. Collectively, I refer to Defendants Chong, Zhuang, Wong, Chen, Brody, Hollander, and Liu as the "Individual Defendants."

### B. Fuqi's Background and Organizational Structure.

Fuqi's primary operations are conducted through a wholly-owned subsidiary, Fuqi International Holdings Co., Ltd., a British Virgin Islands corporation ("Fuqi BVI") and its wholly owned subsidiary, Shenzhen Fuqi Jewelry Co., Ltd. ("Fuqi China"), a company established under the laws of China.[13]

Fuqi was born of a reverse-merger transaction (the "Reverse Merger") involving Fuqi BVI and VT Marketing Services, Inc. ("VT"), a corporation formed as part of the Chapter 11 reorganization plan ofvisitalk.com, Inc.[14] Prior to the Reverse Merger, Chong was the sole stockholder of Fuqi BVI. On November 20, 2006, Chong, Fuqi BVI, and VT entered into a share exchange agreement to effect the Reverse Merger.[15] Under the agreement, Chong agreed to exchange all of his shares of Fuqi BVI for shares of VT, and VT agreed to acquire all of the issued and outstanding capital stock of Fuqi BVI.[16] The Reverse Merger closed on November 22, 2006, and VT issued 11,175,543 shares of common stock in exchange for all of the issued and outstanding shares of Fuqi BVI.[17] Upon the Reverse Merger's closing, VT became the 100% parent of Fuqi BVI and assumed the operations of Fuqi BVI and Fuqi China as its sole business.[18] On December 8, 2006, VT reincorporated in Delaware, having previously been organized under the laws of Nevada,[19] and changed its corporate name from "VT Marketing Services, Inc." to "Fuqi International, Inc."[20]

### C. Fuqi's Public Offering and Associated Disclosures.

Fuqi's Reverse Merger facilitated Fuqi's access to the U.S. capital markets.[21] Following the Reverse Merger, Fuqi began

8. *Id.*

9. *Id.* ¶ 15.

10. *Id.* ¶ 14.

11. *Id.* ¶ 16.

12. *Id.* ¶¶ 17, 18.

13. *Id.* ¶ 27.

14. *Id.* ¶¶ 28, 29.

15. *Id.*

16. *Id.*

17. *Id.* ¶ 29.

18. *Id.* ¶ 30.

19. VT had previously reincorporated in November 2006 from Arizona to Nevada. *Id.*

20. *Id.*

21. *Id.* ¶ 2.

issuing press releases and filings with the SEC that reported strikingly strong growth.[22] On July 31, 2009, Fuqi completed a public offering of 5.58 million of shares of common stock at a price of $21.50 per share.[23] Gross proceeds were approximately $120 million.[24]

### D. Fuqi Announces Material Weakness in Accounting Methods.

On March 16, 2010, Fuqi announced that its fourth quarter 10–Q and 10–K for 2009 would be delayed because Fuqi had discovered "certain errors related to the accounting of the Company's inventory and cost of sales."[25] The press release stated that the errors identified were expected to have a material impact on Fuqi's previously issued quarterly financial statements for 2009 and that "at least one of the identified deficiencies . . . constitutes a material weakness. . . ."[26] This press release was followed by another dated April 7, 2010, in which Fuqi disclosed that it had received a notification letter from NASDAQ that

Fuqi was no longer in compliance with NASDAQ rules requiring the timely filing of SEC reports.[27] On September 8, 2010, Fuqi announced that the SEC had initiated a formal investigation into Fuqi, related to Fuqi's failure to file timely periodic reports, among other matters.[28]

### E. Fuqi Stockholders File Securities and Derivative Actions Outside of Delaware.

After Fuqi announced that its 2009 financial statements needed restatement, Fuqi stockholders filed several securities and derivative lawsuits on behalf of Fuqi against the Individual Defendants in federal and state courts. Ten securities class action lawsuits were filed in the United States District Court for the Southern District of New York within weeks of the March 16, 2010 press release.[29] Three derivative suits were filed on behalf of Fuqi in April 2010, two in federal court[30] and one in New York State court.[31] The derivative suits allege that the directors and certain officers of Fuqi breached their

---

22. For example, on May 15, 2009, Fuqi issued a press release stating that "[r]evenues for the first quarter of 2009 increased 41.0%. . . ." and that "Net Income . . . increased 52%. . . ." *Id.* at ¶ 32. The press release also contained revenue projections of approximately $90 million for the second quarter of 2009 as well as $450 million for the full year 2009. *Id.* at ¶ 33. The same day, Fuqi filed a Form 10–Q with the SEC confirming the financial results and projections of the press release. *Id.* ¶ 34. The May 15 press release and 10–Q were followed by a July 22, 2009 press release. The July 22 press release claimed that earnings per share would be at or higher than Previously released forecasts. *Id.* ¶ 35.

23. *Id.*

24. *Id.*

25. *Id.* ¶ 40.

26. *Id.* ¶¶ 40, 41.

27. *Id.* ¶ 42.

28. *Id.*

29. Reed Aff. Ex. B (July 26, 2010 Consolidation Order). These actions arose out of Fuqi's announcement of accounting errors and alleged material misstatements of Fuqi's 2009 quarterly public filings in violation of Section 10(b), Rule 10b–5, and Section 20(a) of the Exchange Act. *Id.*

30. Reed Aff. Ex. C., *Frank Vanky v. Yu Kwai Chong, et al,* Cause No. 10–CV–4028 (S.D.N.Y. Apr. 15, 2010); Reed Aff. Ex. D, *Richard C. Starkey v. Yu Kwai Chong, et al,* Cause No. 10–CV3346 (S.D.N.Y. Apr. 20, 2010).

31. Reed Aff. Ex. F., *Gilbert v. Chong,* Index No. 601141/2010 (N.Y.Sup.Ct. Apr. 29, 2010). This action was stayed on June 29, 2010 in deference to the federal derivative actions. Reed Aff. Ex. G, *Gilbert v. Chong,* Index No. 601141/2010 (N.Y. Sup.Ct. June 29, 2010).

fiduciary duties by failing to adequately supervise and control Fuqi, which resulted in the filing of false financial statements.[32] Each of the claims brought in federal court—including the derivative actions and the securities class actions—were subsequently consolidated for discovery purposes on July 26, 2010 (the "Federal Action"), and a lead plaintiff was selected.[33] The parties to the Federal Action agreed that the plaintiffs would file an amended complaint in that action after Fuqi files its restated financial statements.[34] Fuqi has not yet filed audited financial statements, so the Federal Action remains stayed. At oral argument, the parties noted that very little has been done so far in the Federal Action since the case has been stayed. With regard to the derivative claims, most relevant for this Court's purposes, the defendants have not all been served in the Federal Action.[35]

### F. Plaintiff Rich Makes a Demand to the Fuqi Board of Directors.

On July 19, 2010, Plaintiff Rich made a demand to the Fuqi Board to commence an action against certain directors and executive officers of Fuqi (the "Demand Letter").[36] The Demand Letter asked the board of directors to "take action to remedy breaches of fiduciary duties by the directors and certain executive officers of the Company" as well as to "correct the deficiencies in the Company's internal controls that allowed the misconduct to occur."[37] The Demand Letter also informed the board that if Fuqi did not respond to the letter within a reasonable period, the Plaintiff would commence a stockholder derivative action on behalf of Fuqi.[38] Fuqi never responded to the Demand Letter in writing.[39]

### G. Fuqi Appoints the Special Internal Investigation Committee.

On October 29, 2010, Fuqi announced the appointment of Kim K.T. Pan as a new independent member of the board of directors.[40] In response to the demand, the directors formed a "Special Internal Investigation Committee" and appointed Pan

---

**32.** *See* Reed Aff. Exs. C, D.

**33.** Reed Aff. Ex. B, *In re Fuqi Int'l, Inc. Sec. Litig.*, Cause No. 10–CIV–02515 (July 26, 2010) (the "Federal Action").

**34.** Reed Aff. Ex. H, Stipulation and Order Regarding Filing of Consolidated Compl. & Am. Compl. and Br. Sched., Feb. 11, 2010. In June 2011, the parties to the Federal Action entered into a protective order to allow the sharing of certain information for the purpose of settlement discussions. Reed Aff. Ex. I, Stipulation and Protective Order Governing Production of Settlement Negotiation Materials, June 3, 2011.

**35.** It is unclear whether a federal court sitting in New York has personal jurisdiction over all or any of the Defendants here. Unlike New York, Delaware has jurisdiction over each of the Defendants here, since Fuqi is a Delaware corporation and its directors are therefore subject to Delaware jurisdiction.

**36.** *Id.* ¶ 43; Compl. Ex. A, Letter to Yu Kwai Chong, July 19, 2010.

**37.** Compl. ¶ 43.

**38.** *Id.*

**39.** *Id.* ¶¶ 64, 65 ("Approximately three months after making the Demand, Fuqi's prior counsel informed Plaintiff's counsel that the Demand had been referred to the Special Committee for consideration and investigation. Plaintiff has never received a written response to the Demand, but over the course of the ensuing two years Plaintiff's counsel has had periodic telephonic communications with prior counsel for the Company and counsel for the Special Committee.").

**40.** *Id.* ¶ 45.

and Chen to serve as its members (the "Special Committee").[41] The board authorized the Special Committee to retain experts and advisors to investigate whether the claims in the demand were meritorious.[42] Disclosure of the Special Committee's formation was the only information Fuqi ever disclosed to the stockholders regarding the Special Committee.[43] The Plaintiff contends that the Special Committee "never conducted any investigation or any other activity during its short-lived existence."[44] Furthermore, by March 2012 the Special Committee effectively ceased to exist after losing both of its members, Pan and Chen, due to Chen's resignation and Pan's appointment as CEO.[45]

### H. Fuqi Discloses Material Weaknesses and Cash–Transfer Transactions.

From the time the Plaintiff sent the Demand Letter to the present, Fuqi has released additional negative information about its accounting errors, lack of internal controls, and mismanagement of corporate resources. For instance, on March 16, 2011, Fuqi filed a Form NT 10–K with the SEC announcing that the financial statements for the quarterly periods ending March 31, 2009; June 30, 2009; and September 30, 2009 would be restated due to accounting errors.[46] These accounting errors related to:

(i) incorrect carve-out of the retail segment from the general ledger;

(ii) unrecorded purchases and accounts payable, (iii) inadvertent inclusion of consigned inventory, (iv) incorrect and untimely recordkeeping of inventory movements of retail operation; and (v) incorrect diamond inventory costing, unrecorded purchases and unrecorded accounts payable.[47]

In other words, Fuqi's financial statements were replete with basic accounting errors. The Form NT 10–K further disclosed that Fuqi had identified material weaknesses in its disclosure controls, procedures, and internal control over financial reporting.[48] These material weaknesses include Fuqi's failure to "maintain effective controls . . . over its accounting and finance personnel . . ., the inventory and purchasing cycles, the accounting of complex and non-routine transactions, internal audit function, and treasury function."[49]

Two weeks later, Fuqi announced that its Audit Committee was conducting an investigation relating to certain cash-transfer transactions that had been discovered by Fuqi's independent auditor during

---

41. *Id.*

42. *Id.*

43. *Id.* ¶ 46.

44. *Id.* ¶¶ 46, 66 ("According to the Special Committee's counsel, during the time it existed the Special Committee held no meetings and conducted no investigation or any other activities beyond an introductory telephone call with counsel.").

45. *Id.* ¶ 67. Fuqi argues that Pan is still an active member of the Special Investigative Committee despite his position as the company's CEO. Defs.' Op. Br. 11. However, Pan is also serving as Fuqi's acting CFO and is the leader of the Fuqi management team that failed to pay the fees of the Audit Committee's legal counsel and consultants in investigating the alleged wrongdoing, as described below. Given these facts, I am content at this point to assume that Pan is not a member of the Special Committee, or at least not a member operating in good faith.

46. Compl. ¶ 47.

47. *Id.*

48. *Id.* ¶ 48.

49. *Id.*

Fuqi's preparation of its restated quarterly financial statements for 2009.[50] Fuqi made the cash-transfer transactions, between September 2009 and November 2010, to parties that are "registered legal entities in China." [51] Chong, Fuqi's Chairman of the board, authorized the transfers pursuant to an oral agreement with Fuqi's bank.[52] The entities receiving these cash transfers are Chinese entities, "but the Company has not been able to confirm the accuracy of their business addresses nor determine the extent and nature of their business operations, if any." [53] As of March 2011, the company had found no evidence that the receiving entities were related to any of Fuqi's managers or directors.[54] Fuqi has represented that "all of the outgoing cash transfers made by the Company were repaid in full by the recipient companies on a short-term basis, with no loss resulting from the transfers." [55] However, Fuqi has not produced audited financial statements to confirm that these amounts have been repaid. The aggregate amount of the cash transfers totaled $86.3 million for 2009 and $47.5 million for 2010.[56]

In essence, Fuqi transferred cash out of the company to third parties, outside of the U.S., who have yet to be verified as legitimate businesses. Fuqi has asserted, but not demonstrated, that the cash has been restored. The press release disclosing these events concluded with "[t]he internal investigation is ongoing." [57] Since this press release in 2011, Fuqi has provided no additional information about the investigation to the stockholders.[58]

The following day, because of Fuqi's ongoing failure to file timely financial statements, NASDAQ delisted Fuqi stock from the exchange.[59] Although it once traded at close to $30 per share, Fuqi stock now trades on the pink sheets for approximately $1 per share.[60]

### I. Fuqi's Investigation.

Although there is no evidence that the Special Committee performed any investigation, the Audit Committee did begin an investigation into Fuqi's accounting problems. Fuqi's Audit Committee, which apparently predates its disclosure problems, consisted of board members Hollander, Brody and Liu.[61] Fuqi contends that the Audit Committee has "conducted a lengthy assessment and remediation of its internal and financial controls" resulting in "significant progress." [62]

Fuqi's auditors requested that the Audit Committee perform an expedited investigation of the cash-transfer transactions.[63] The Audit Committee retained a Chinese law firm to investigate the transactions

50. *Id.* ¶ 50.

51. Reed Aff. Ex. K, Form 8–K Attaching Press Release Disclosing Status of Audit, Mar. 28, 2011.

52. *Id.*

53. *Id.*

54. *Id.*

55. *Id.*

56. *Id.*

57. Compl. ¶ 50.

58. *Id.* ¶ 51.

59. *Id.* ¶ 49.

60. *Id.*

61. *Id.* ¶¶ 26, 17–19. Brody and Hollander have since resigned, so it seems that Liu is now the sole member of the Audit Committee. *Id.* ¶ 58.

62. Defs.' Op. Br. 7.

63. Reed Aff. Ex. K, Form 8–K, Mar. 28, 2011.

and determine whether Fuqi had violated Chinese or U.S. law.[64] In February 2011, the Audit Committee engaged special investigative counsel and a forensic accountant after Fuqi's auditors requested that the Audit Committee conclude its investigation.[65] After the Audit Committee shared its preliminary findings with its auditors, the auditors requested that the Audit Committee expand the investigation.[66]

Whatever progress the Audit Committee made in uncovering and correcting the causes of Fuqi's problems has allegedly stalled. According to Brody and Hollander (two of the three former members of the Audit Committee), Fuqi management failed to pay the fees of the Audit Committee's outside legal counsel, forensic specialists, and auditor.[67] As a result, these professionals have either withdrawn from advising or suspended their services to the Audit Committee.[68] In January 2012, Brody and Hollander resigned as Fuqi directors, and as members of the Audit Committee, in protest of the defunding.[69]

Because the Audit Committee has failed to complete its audits of years 2009, 2010, and 2011, Fuqi has not filed any audited financial statements for over three years. As of March 28, 2012, Fuqi has represented to the SEC and to this Court that it is unable to estimate when it will file its audited financial statements.[70]

Although Fuqi has still not completed its investigation, Fuqi has disclosed to its stockholders that the cash-transfer transactions were the result of material weaknesses in Fuqi's internal controls.[71] For example, Fuqi has acknowledged "the Company's treasury controls did not require that internal fund transfer applications identify any specific business purpose or be accompanied by supporting documentation, such as a copy of a relevant invoice, purchase order, contract, or prepayment statement."[72]

### J. Fuqi Experiences Mass Defections in Leadership.

From June 2010 until March 2012, Fuqi's board of directors and executive team experienced mass defections. These defections are detailed below:

- On June 11, 2010, Xi Zhou Zhuo resigned as Marketing Director of Fuqi;

- On June 16, 2011, Wong resigned as a director but remained as Fuqi's CFO;

- On June 17, 2011, Chong resigned as Fuqi's CEO and was replaced by the previously independent director, Kim Pan;

- On July 30, 2011, Wong resigned as Fuqi's CFO, and CEO Pan also became Interim CFO, which he remained until the time of the Complaint;

- On January 3, 2012, Brody and Hollander resigned as directors;

---

64. *Id.*

65. *Id.*

66. *Id.*

67. *See* Reed Aff. Exs. L, M.

68. *Id.*

69. *Id.*

70. Reed Aff. Ex. M, Form 12b–25, Notification of Late Filing (Mar. 28, 2012).

71. Reed Aff. Ex. K, Form 8–K, Mar. 28, 2011.

72. *Id.*

- On January 16, 2012, Frederick Wong resigned as Vice President of Special Projects; and

- On March 31, 2012, Chen resigned as a director.[73]

Xi Zhou Zhuo, Wong, Chong, Frederick Wong, and Chen reportedly resigned for "personal reasons."[74] However, Brody and Hollander expressly resigned because of management's failure to pay the fees of legal, auditing, and other professional-service providers engaged by the Audit Committee, and because of management's assumption of responsibility and authority for engaging a professional accounting firm without the approval of the Audit Committee.[75] In their words, Brody and Hollander felt compelled to resign "[b]ecause the Audit Committee's efforts to serve the shareholders of Fuqi have been completely frustrated by Management."[76]

Fuqi responded publicly to Brody and Hollander's grievances in a Form 8–K filed on January 3, 2012.[77] Fuqi argued that the Audit Committee's expenses had not been paid due to discrepancies with its insurer.[78] It further contended that management had the right to select its own auditor.[79] Brody and Hollander responded to these defenses via a letter to the Board on January 9, 2012.[80] Without going into the details of this letter, it suffices to say that Brody and Hollander dispute the board's characterization.[81]

## K. The Allegations against the Individual Defendants.

As a procedural matter, the Plaintiff argues that he should not have to prove demand futility because (1) he made a demand, and (2) "the Board has not acted, is not acting, and will not act in response to the Demand."[82] The Plaintiff draws support for this statement from the fact that the Board's Special Committee has had no meetings, released no progress reports, and now has no members. Finally, the Plaintiff alleges that the Defendants have had sufficient time to investigate this matter since over two years has passed since the Demand Letter was written.[83]

Substantively, the Plaintiff alleges that the Individual Defendants breached their fiduciary duty of loyalty.[84] Specifically, the Plaintiff contends that

[E]ach of the Individual Defendants knowingly, and in a sustained and systematic manner, failed to institute and maintain adequate internal controls over Fuqi's accounting and financial reporting, failed to make a good faith effort to correct or prevent the deficiencies and accounting and financial problems caused thereby, and knowingly caused or allowed the Company to disseminate to shareholders false and misleading financial statements.[85]

The Plaintiff alleges that the Individual Defendants were aware that Fuqi's public

---

73. Compl. ¶ 52.

74. *Id.* ¶ 53.

75. *Id.*

76. Reed Aff. Ex. L, Form 8–K attaching Letters of Resignation from Brody and Hollander to Fuqi's Board of Directors, Jan. 3, 2012.

77. Compl. ¶ 54.

78. *Id.*

79. *Id.*

80. *Id.* ¶ 55.

81. *Id.* ¶¶ 55, 56.

82. *Id.* ¶ 68.

83. *Id.* ¶¶ 68, 69.

84. *Id.* ¶ 72.

85. *Id.*

filings grossly misstated Fuqi's financial position.[86] He contends that the Individual Defendants had this knowledge because they "had knowingly engaged in improper financial reporting and accounting practices, including, but not limited to, improperly reporting revenues, expenses and net income."[87] The Plaintiff also alleges that Fuqi had "virtually no meaningful internal accounting and financial reporting controls, and ... the Individual Defendants willfully ignored the Company's obvious and pervasive lack of controls and made no good faith effort to correct or prevent the disaster that would ensue as a result."[88] As damages, the Plaintiff seeks the costs and expenses incurred in connection with the accounting-restatement process, the SEC's investigation, and NASDAQ's delisting of Fuqi.[89]

### L. Related Actions and Procedural History.

It should be noted that these parties are involved in a contemporaneous suit before this Court and before a federal court. On July 21, 2010, before filing this action, the Plaintiff filed a complaint seeking an order compelling Fuqi to hold its annual stockholder meeting as required by 8 *Del. C.* § 211.[90] I granted summary judgment for the Plaintiff and ordered Fuqi to hold its annual stockholder meeting by December 17, 2012.[91] Fuqi asked me to certify an interlocutory appeal of that order on the grounds that holding an annual stockholder meeting was "physically impossible" for Fuqi because it had not filed audited financial statements for three years and holding such a meeting would therefore be in contravention of SEC rules.[92] I denied certification of that question for interlocutory appeal because I found that the standards under Supreme Court Rule 42 were not met.[93] Fuqi then sought leave to appeal my order from the Supreme Court. The Supreme Court denied Fuqi's request on November 9, 2012.[94]

Fuqi then sought relief from my Order from the United States District Court for the District of Delaware, seeking "a declaration that Regulations 14A and 14C promulgated by the Securities and Exchange Commission under Section 14 of the Exchange Act preempt Section 211 of the Delaware General Corporation Law."[95] Fuqi sought injunctive relief, as well as a temporary restraining order, against my order compelling Fuqi to hold its annual stockholder meeting.[96] The District of Delaware heard Fuqi's motion for a temporary restraining order on an expedited basis, and, in a ruling from the bench on November 16, 2012, denied Fuqi's motion.[97] Fuqi then moved for a preliminary injunction, which was likewise denied on

---

86. *Id.* ¶ 38.

87. *Id.*

88. *Id.* ¶ 39.

89. *Id.* ¶ 73.

90. *See Rich v. Fuqi Int'l, Inc.,* 2012 WL 5392162, at *1 (Del.Ch. Nov. 5, 2012).

91. *Id.* at *2.

92. *Id.*

93. *Id.* at *5–6. I also denied Fuqi's request for a partial final judgment, because my ruling left open the possibility of a different result, pending future action by the SEC, and thus was not final. *Id.* at *5.

94. *Fuqi Int'l, Inc. v. Rich,* 2012 WL 5470770, at *1 (Del. Nov. 9, 2012).

95. *See* Letter to Court from Fuqi Int'l, Inc. 1, Nov. 14, 2012.

96. *Id.*

97. *In re Fuqi Int'l, Inc.,* Civil Action No. 12–1457–UNA, at 37:3–6 (D.Del. Nov. 16, 2012) (TRANSCRIPT).

December 17, 2012.[98] Since that time, Plaintiff Rich has moved to hold Fuqi in contempt of my Order.

The Complaint in this action was filed on June 13, 2012. Fuqi moved to dismiss the Complaint on July 16, 2012.[99] Following briefing on the motion, oral argument was held on January 7, 2013, after which I reserved decision. A further conference in this matter was held on February 11, 2013. This is my Opinion on Defendant Fuqi's Motion to Dismiss or Stay this action.

## III. ANALYSIS

### A. The Demand Requirement.

 As a threshold matter, I must decide whether Fuqi's failure to respond to the Demand justifies the Plaintiff's prosecution of this suit derivatively. Court of Chancery Rule 23.1 permits a stockholder to pursue an action on behalf of a corporation derivatively, where "the corporation ... [has] failed to enforce a right which may properly be asserted by it...."[100] The Rule requires a stockholder to make (or justify excusal of) a demand to the board of directors before the stockholder may bring a suit derivatively.[101] A stockholder plaintiff must allege with particularity "the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to obtain the action or for not making the effort."[102] Where a plaintiff seeks to proceed without a demand, he may satisfy the Rule where he alleges particular facts that raise a reasonable doubt, because of a conflict of interest or lack of independence, that the board could render a response to a demand without violating its duty of loyalty.[103] Similarly, where the plaintiff has made a demand, the Rule is satisfied and the plaintiff may proceed derivatively where he raises a reasonable doubt that the board's failure to acquiesce to his demand is in compliance with its fiduciary duties; that is, was wrongful.[104]

98. *In re Fuqi Int'l Inc.*, 2012 WL 6589152, at * 3 (D.Del. Dec.17, 2012).

99. Defs.' Mot. Dismiss 1, July 16, 2012.

100. Ct. Ch. R. 23.1.

101. *Id.*

102. *Spiegel v. Buntrock*, 571 A.2d 767, 771 n. 7 (Del.1990)(quoting Ct. Ch. R. 23.1).

103. *See Rales v. Blasband*, 634 A.2d 927, 934 (Del.1993) ("[A] a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.").

104. *See Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 11 (Del.Ch.1991) (allowing a derivative plaintiff to proceed because the plaintiff had raised a reasonable doubt that the actions of the board of directors were reasonable and taken in good faith). In a seminal case discussing a stockholder's standing to sue derivatively, *Dodge v. Woolsey*, the Supreme Court of the United States held that the basis of the stockholder's derivative standing was the directors' breach of fiduciary duty arising from the directors' wrongful refusal of the stockholder's demand. *Dodge v. Woolsey*, 59 U.S. 331, 336, 344, 18 How. 331, 15 L.Ed. 401 (1855) ("[W]here the directors of a bank refused to take the proper measures ..., this refusal amounted to what is termed in law a breach of trust, [and] a stockholder had a right to file a bill in chancery asking for such a remedy as the case might require."). *Dodge* was the predecessor of *Hawes v. City of Oakland*, the case that has been acknowledged as the genesis of the demand requirement. *See Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 543, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) (Stevens, J., concurring)("[T]he demand requirement was not created by the rule, but rather by a decision of this Court, *Hawes v. City of Oakland....*"). The *Hawes* Court "established a number of prerequisites to bringing derivative suits ... designed to limit the use of the device to situations in which, *due to an unjustified failure of the corporation to act for*

■ Once a stockholder has made a demand, he is precluded from arguing that a demand is excused.[105] The board of directors is entitled to a reasonable period of time to respond to the demand.[106] Until the board has responded to a demand, the stockholder generally may not move forward with a derivative action.[107] The demand requirement preserves a core function of the board of directors—to determine whether litigation on behalf of the corporation should proceed—and balances this function with the right of stockholders to pursue the interests of the corporation in the face of the board's wrongful refusal or inability to act.

■ By making a litigation demand on a board of directors, a stockholder concedes that the board is able to evaluate the demand, free from concerns of conflicts of interest or lack of independence.[108] Once the stockholder makes a demand, the board has an affirmative duty to evaluate the demand and to determine if the litigation demanded is in the best interest of the stockholders.[109] Where the board fails to accede to the plaintiff's demand, Rule 23.1 requires that the plaintiff plead with particularity why that failure to accede is wrongful.[110] If the board rejects the demand, the plaintiff may satisfy his burden under Rule 23.1 by raising a reasonable doubt that the denial was in compliance with the board's fiduciary duties. Similarly, as described in more detail below, where the board has not responded to a demand, the plaintiff satisfies the rule, and may proceed, upon raising a reasonable doubt that the board's lack of a response is consistent with its fiduciary duties.[111]

■ Relatively few Delaware cases have arisen in which a stockholder attempts to move forward with a derivative suit *before* a board formally responds to the stockholder's demand. Where the board has taken no action and has simply failed to address the demand, the stockholder satisfies Rule 23.1 and may proceed derivatively if he demonstrates that the failure to act is wrongful, an analysis that in past cases has turned on the time available to the board for response in light of the allegations in the demand.[112] Other

*itself,* it was appropriate to permit a shareholder 'to institute and conduct a litigation which usually belongs to the corporation.' " *Daily Income Fund,* 464 U.S. at 530, 104 S.Ct. 831 (quoting *Hawes v. City of Oakland,* 104 U.S. 450, 460, 26 L.Ed. 827 (1881)).

105. *Spiegel,* 571 A.2d at 774–75.

106. *Abbey v. Computer & Commc'ns Tech. Corp.,* 457 A.2d 368, 371 (Del.Ch.1983).

107. *Charal Inv. Co., Inc. v. Rockefeller,* 1995 WL 684869, at *2 (Del.Ch. Nov. 7, 1995).

108. *Thorpe,* 611 A.2d at 10.

109. *Grimes v. Donald,* 673 A.2d 1207, 1218–19 (Del.1996).

110. *See* Ct. Ch. R. 23.1 (requiring a stockholder to allege with particularity "the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... *and the*

*reasons for his failure to obtain the action....*" (emphasis added)).

111. *Grimes,* 673 A.2d at 1219 ("If there is reason to doubt that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal. The stockholder then has the right to bring the underlying action with the same standing which the stockholder would have had, *ex ante,* if demand had been excused as futile.").

112. *E.g., Charal,* 1995 WL 684869, at *2–3 (analyzing whether a board of directors had a "reasonable time" to respond to a stockholder demand). There are numerous cases applying this standard in the federal courts, both under Delaware law and the analogous Federal Rule of Civil Procedure 23.1. *E.g., Recchion v. Kirby,* 637 F.Supp. 1309, 1318–19 (W.D.Pa.1986) (applying the reasonable time inquiry to a demand made under Fed. R. Civ.

cases, however, including this case, involve board action which has not yet resulted in a formal response to the demand, and a request by the board that the plaintiff's action be dismissed so that the board's investigation may continue. In such cases, once a demand has been made, the board has taken some action in response, and the demanding stockholder has then sued as a derivative plaintiff *before* the board has responded to the demand, the methods and manner in which the board has chosen to act on the demand represent judgments entitled to the benefit of the business judgment rule if taken in a manner that was informed and in good faith.[113] That benefit is that the Court must presume that the actions of the board are in the corporation's interest, and the Court will accordingly dismiss the derivative action. The business judgment rule, however, provides no protection in cases of bad-faith conduct,[114] such as "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to

act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[115] Similarly, the business judgment rule does not apply if directors fail to inform themselves of all material information reasonably available to them and fail to act with requisite care.[116] If the plaintiff is able to raise a reasonable doubt that the directors are acting in good faith or with due care, the directors' actions taken in response to a demand are not entitled to the business judgment rule's presumption that the directors are acting in the corporate interest.[117] Therefore, where the plaintiff by particularized pleading has raised a reasonable doubt that the board's actions are in compliance with its fiduciary duties, Rule 23.1 is satisfied and the plaintiff may proceed derivatively.[118]

In *Thorpe v. CERBCO, Inc.*, then-Chancellor Allen applied a business judgment rule analysis to the actions of the CERBCO board in considering a stockholder demand.[119] There, a stockholder made a demand to the CERBCO board of directors to investigate breaches of fiduciary duty arising under a controlling stockholder's sale of its shares.[120] Two months later,

---

Proc. 23.1); *Mills v. Esmark, Inc.*, 91 F.R.D. 70, 73 (N.D.Ill.1981) (same).

**113.** *Cf. Thorpe*, 611 A.2d at 11 (allowing a derivative plaintiff to proceed upon the plaintiff's raising of a reasonable doubt concerning the board's good faith in responding to a demand). *See also Charal*, 1995 WL 684869, at *2 ("[O]nce the shareholder makes the demand on the board, thereby conceding that a majority of the board is independent, the Court's only inquiry is into the board's good faith and the reasonableness of the investigation.").

**114.** *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del.2006).

**115.** *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006).

**116.** *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000).

**117.** Because the relevant inquiry here is a determination of whether the demand requirement has been satisfied, rather than a determination of liability, a violation of the duty of care in response to the demand is sufficient to remove the board's actions from the business judgment rule presumption, regardless of whether the directors are insulated from liability under § 102(b)(7). The relevant standard of review for a care violation is gross negligence.

**118.** *Thorpe*, 611 A.2d at 11.

**119.** *Id.* at 10–11.

**120.** *Id.* at 8. The plaintiff stockholders sought to rescind the transaction or to compel an accounting of the control premium the controlling stockholders received. *Id.*

the CERBCO board appointed two directors to serve on a special litigation committee to review the demand.[121] Within six months from its appointment, the special litigation committee conducted an investigation and prepared a report detailing its findings.[122] The members of the special litigation committee then resigned from the CERBCO board of directors.[123] CERBCO never showed the contents of the report to its stockholders, nor did the directors formally respond to the plaintiff's demand.[124] By the time of the Court's decision, ten months had passed from the time the special litigation committee finished its report, and the board of directors still had not acted on the report.[125]

Then–Chancellor Allen found that, since the plaintiff had made a pre-suit demand on the CERBCO board of directors, the plaintiff had conceded the board's independence and ability to investigate the alleged wrongdoing.[126] Applying the business judgment rule, the Court assessed whether the CERBCO board had acted in good faith: [127]

> It may be that the special committee did function in good faith and prudently.... One cannot know that yet, but the alleged resignation of the members of the committee from the board following submission of the report is not inconsistent with that possibility. The board however has apparently not acted on that report. No action at all has been taken so far as the complaint (or the record otherwise) shows. How in these circumstances can the committee's investigation, even if it is presumed to be in good faith and reasonable, itself preclude judicial review of the claim of corporate injury by the self-interested controlling shareholder? Even if one is required to presume the independence of a majority of the board and if one assumes that the special committee operated in good faith and reasonably, nevertheless, the circumstances alleged (the failure of the board to act on the report, the failure to disclose it to the stockholders after request and the resignation of the committee members from the board), if considered to be true, do raise a reasonable doubt concerning the whole board's good faith and justify my conclusion that the requisites of Rule 23.1 have been satisfied here.[128]

As in *Thorpe*, the Fuqi board has taken action in response to the Plaintiff's demand, and asks that I allow it to continue its consideration of the demand, a consideration that has occupied, theoretically, some two-and-one-half years.[129] Also consistent with *Thorpe*, the Plaintiff here has pled facts providing me reason to doubt the good faith of the Fuqi board. The Plaintiff sent the Demand Letter to the Fuqi board of directors on July 19, 2010.[130] As a result, the Plaintiff will be deemed to have conceded the independence and disinterestedness of the board.[131] Because Fuqi has not formally rejected the

---

121. *Id.*

122. *Id.*

123. *Id.*

124. *Id.*

125. The report was finished by the end of 1990. *Id.* The Court's opinion was published in November 1991. *Id.* at 5.

126. *Id.* at 10.

127. *Id.* at 10–11.

128. *Id.* at 11.

129. Compl. ¶¶ 68, 69.

130. Compl. ¶ 43; Compl. Ex. A, Letter to Yu Kwai Chong, July 19, 2010.

131. *See Thorpe*, 611 A.2d at 10.

Demand Letter, I must determine whether the Plaintiff has pled particular facts creating a reasonable doubt that the Fuqi board is acting in good faith and with due care in investigating the facts underlying the Demand to assess whether the Plaintiff has satisfied Rule 23.1 and may proceed derivatively.

The Plaintiff has alleged that (1) he made a demand; (2) Fuqi took steps to begin an investigation; (3) that investigation appears to have uncovered some amount of corporate mismanagement; (4) Fuqi has not acted on the information uncovered; (5) the Special Committee appointed by the Board to investigate the demand became defunct before making a recommendation; (6) by de-funding the advisors to the Audit Committee, Fuqi has deliberately abandoned that investigation, and has taken no action through the Audit Committee for at least 12 months; and (7) the independent directors have left the company, some in protest of management's actions.

 Fuqi's argument that these allegations are insufficient to raise a reasonable doubt that the Board has acted in good faith is unpersuasive.[132] First, if I consider the Fuqi board's abandonment of the investigation as an abdication of its duty to investigate the demand, then the protections of the business judgment rule do not apply.[133] Specifically, the business judgment rule "has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act."[134] Here, the Plaintiff has pled facts with particularity that show that the Fuqi board has abdicated its responsibilities because the investigation has been left in limbo, with no progress, for several months. Under that view of the facts, Fuqi management is not entitled to the business judgment rule's protections. Beyond that, Fuqi management has refused to pay for the professional advisors—including auditors and legal counsel—of the Audit Committee performing the investigation. This lack of payment has thwarted what efforts could have been taken by the Audit Committee to investigate.[135] To make matters worse, the independent directors, who could have conducted a meaningful investigation on behalf of the company, have resigned from their posts. Thus, the Plaintiff has alleged with particularity that the board has not only failed to move the investigation forward, but has also impeded that investigation. Nor does the record indicate that the investigation continues. It has been abandoned.

The Plaintiff has pled with particularity facts that create a reasonable doubt that the Fuqi board has acted in good faith in investigating the Plaintiff's demand. Therefore, I find that the requirements of Rule 23.1 have been satisfied. I assess the remainder of Fuqi's grounds for dismissal under the more lenient pleading standards of Rule 12(b)(6).

### B. Caremark Claim and 12(b)(6) Analysis.

The Plaintiff alleges that Fuqi's directors are liable for failure to oversee the operations of the corporation. Fuqi ar-

---

132. *See* Defs.' Op. Br. 10.

133. *See Aronson*, 473 A.2d at 811–13.

134. *Id.*

135. Fuqi's explanation that the fees have not been paid because of insurance disputes or billing issues is unsatisfactory. First, the in-

dependent directors' resignations expressly rebut this characterization of the facts. Second, more than one of the professional advisors has resigned due to lack of payment. In any event, the facts pled must only raise a reasonable doubt as to the Board's good faith, which I find they do.

gues that the Complaint fails to plead facts that show that the directors "consciously and in bad faith failed to implement any reporting or accounting system or controls."[136] Such claims for bad-faith failure to monitor are known colloquially as "*Caremark* actions."[137] The Defendants have moved to dismiss the action against the board generally. Because they have not articulated that claims against the Individual Defendants should be dismissed on a defendant-by-defendant basis, I refrain from undertaking that analysis.[138]

### 1. Standard of Review Under 12(b)(6).

Under Court of Chancery Rule 12(b)(6), the Court will dismiss a complaint if the plaintiff has failed to state a claim upon which relief can be granted.[139] The standard for reviewing a plaintiff's claims under Rule 12(b)(6) is "reasonable conceivability."[140]

> When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-

pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[141] Dismissal is improper if, accepting all such inferences, "there is a reasonable possibility that a plaintiff could recover."[142]

### 2. The Elements of a Caremark Claim.

■■■ The essence of a *Caremark* claim is a breach of the duty of loyalty arising from a director's bad-faith failure to exercise oversight over the company.[143] A *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[144] I am conscious of the need to prevent hindsight from dictating the result of a *Caremark* action; a bad outcome, without more, does not equate to bad faith.[145] To survive a motion to dismiss, the plaintiff must plead facts that allow a reasonable inference that the defendants

---

**136.** Defs.' Op. Br. 1.

**137.** *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del.Ch.1996).

**138.** It may be that some of the former independent directors, including Hollander and Brody, attempted to fulfill their duties in good faith. For example, based on the pleadings and Fuqi's disclosures, the Audit Committee was attempting to investigate the demand before its efforts were thwarted by management. Nonetheless, even though Hollander and Brody purported to resign in *protest* against mismanagement, those directors could still conceivably be liable to the stockholders for breach of fiduciary duty. As Chancellor Strine recently noted, it is troubling that independent directors would abandon a troubled company to the sole control of those who have harmed the company. *See In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476–CS 15–17, Feb. 6, 2013 (TRANSCRIPT). I do not

prejudge the independent directors before evidence has been presented, but neither are those directors automatically exonerated because of their resignations.

**139.** Ct. Ch. R. 12(b)(6).

**140.** *Wiggs v. Summit Midstream P'rs, LLC*, 2013 WL 1286180, at *4 (Del.Ch. Mar. 28, 2013).

**141.** *Id.* (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del.2011)).

**142.** *Id.* at *5.

**143.** *Stone*, 911 A.2d at 368–70.

**144.** *See Caremark*, 698 A.2d at 967.

**145.** *See Stone*, 911 A.2d at 373.

breached their fiduciary duties.[146]

█ In *Stone v. Ritter,* the Supreme Court clarified that *Caremark* claims are breaches of the duty of loyalty, as opposed to care, preconditioned on a finding of bad faith. The Supreme Court affirmed this Court's language in *Caremark* holding that "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."[147] Demonstrating lack of good faith is the reef upon which most *Caremark* claims founder. There are two possible scenarios in which a plaintiff can successfully assert a *Caremark* claim. The Supreme Court described these scenarios as being either:

> (a) the directors utterly failed to implement any reporting or information system or controls, *or* (b) having implemented such a system or controls, *consciously* failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.[148]

Under either scenario, a finding of liability is conditioned on a plaintiff's showing that the directors knew they were not fulfilling their fiduciary duties.[149] "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."[150] Examples of directors' "disabling themselves from being informed"[151] include a corporation's lacking an audit committee, or a corporation's not utilizing its audit committee.[152]

█ I must analyze the facts alleged here under the lenient pleading standard of Rule 12(b)(6), drawing all reasonable inferences in favor of the Plaintiff, to see if it is reasonably conceivable that he may prevail.[153] Because I find it so, the Motion to Dismiss for failure to state a claim must be denied.

*In re American International Group, Inc. ("AIG")* illustrates how Rule 12(b)(6)'s lenient pleading standard eases this Court's scrutiny of a *Caremark* claim at the motion-to-dismiss stage. In *AIG,* the underlying bases of the *Caremark* claims were several transactions, practices, and deceptive behaviors that caused AIG to restate its shareholder equity by $3.5 billion and to pay $1.6 billion to settle government investigations.[154] Without going into the specific allegations of that case, which were quite complex, the plaintiffs alleged that the defendants had engaged in transactions designed to hide AIG's true financial situation, implemented illegal

---

146. *In re Am. Int'l Group, Inc.,* 965 A.2d 763, 795 (Del.Ch.2009) ("*AIG*").

147. *Stone,* 911 A.2d at 369 (quoting *Caremark,* 698 A.2d at 971).

148. *Id.* at 370 (emphasis added and internal citations omitted).

149. *Id.*

150. *Id.*

151. *Id.*

152. *David B. Shaev Profit Sharing Account v. Armstrong,* 2006 WL 391931, at *5 (Del.Ch. Feb. 13, 2006) *aff'd,* 911 A.2d 802 (Del.2006).

153. *Compare AIG,* 965 A.2d at 799 (declining to dismiss a *Caremark* claim under Rule 12(b)(6)), *with Stone,* 911 A.2d at 370; *In re Citigroup, Inc.,* 964 A.2d 106, 124 (Del.Ch. 2009); and *In re Goldman Sachs Grp., Inc. S'holder Litig.,* 2011 WL 4826104, at *20 (Del. Ch. Oct. 12, 2011) (each dismissing *Caremark* claims under Rule 23.1's more stringent pleading standard).

154. *AIG,* 965 A.2d at 780.

schemes to avoid taxes, sold illegal financial products to other companies, and rigged markets.[155] The largest fraudulent transaction alleged was a $500 million phony reinsurance transaction designed to prop up AIG's financial statements.[156]

The defendant directors, officers, and employees each moved to dismiss the complaint. In deciding whether the complaint should be dismissed, then-Vice Chancellor Strine illustrated the effect of the requirement, under 12(b)(6), that he draw all reasonable inferences in favor of the plaintiffs: [157]

> Although the Stockholder Plaintiffs provide detailed allegations about the illegal transactions and schemes that proliferated at AIG, they are not able to tie all of the defendants directly with the specific facts to all of the schemes. In some instances ... the Complaint only outlines the misconduct that occurred, or pleads the involvement of other [defendants]. But, as discussed above, this is a motion to dismiss, and thus I must grant the Stockholder Plaintiffs the benefit of all reasonable inferences. Even the transactions that cannot be tied to specific defendants support the inference that, given the pervasiveness of the fraud, [the defendants] knew that AIG was engaging in illegal conduct.[158]

The Court explained that, if the case was analyzed under Rule 23.1, certain defendants would be "well positioned" to argue that the complaint needed more specifics to adequately plead knowledge on the part of the defendants.[159] However, because the Court decided the case under Rule 12(b)(6) and because of the pervasiveness and materiality of the alleged fraud, the Court inferred that the defendants knew that AIG's internal controls were inadequate.[160] For the purposes of a 12(b)(6) motion to dismiss, the Court inferred that "even when [the defendants] were not directly complicitous in the wrongful schemes, they were aware of the schemes and knowingly failed to stop them."[161] I find the Court's analysis in *AIG* helpful here.[162] My analysis follows.

### a. Fuqi Had No Meaningful Controls in Place.

One way a plaintiff may successfully plead a *Caremark* claim is to plead facts showing that a corporation had no internal controls in place.[163] Fuqi had some sort of compliance system in place. For example, it had an Audit Committee and submitted financial statements to the SEC in 2009. However, accepting the Plaintiff's allegations as true, the mechanisms Fuqi had in place appear to have been woefully inadequate. In its press releases, Fuqi has detailed its extensive problems with internal controls. For example, Fuqi disclosed its "incorrect and untimely recordkeeping

---

155. *Id.* at 782.

156. *Id.* at 782–83.

157. *Id.* at 782.

158. *Id.*

159. *Id.* at 799.

160. *Id.*

161. *Id.*

162. The Defendant has argued that *Guttman v. Huang*, 823 A.2d 492 (Del.Ch.2003), *Stone v. Ritter*, and *Rattner v. Bidzos*, 2003 WL 22284323 (Del.Ch. Oct. 7, 2003), all dismissing *Caremark* claims, are relevant to my analysis. However, I distinguish each of those cases because they were interpreted under Rule 23.1's more stringent pleading standard.

163. *Stone*, 911 A.2d at 370 (describing one avenue to successfully plead a *Caremark* claim as where "the directors utterly failed to implement any reporting or information system or controls").

of inventory movements of retail operation." Problems with inventory are particularly troubling here, because Fuqi is a jewelry company, specializing in precious metals and gemstones which are valuable and easily stolen. Nonetheless, the Fuqi directors allowed the corporation to operate few to no controls over these vulnerable assets.[164] Fuqi's self-disclosed accounting inadequacies include:

(i) incorrect carve-out of the retail segment from the general ledger;

(ii) unrecorded purchases and accounts payable, (iii) inadvertent inclusion of consigned inventory, (iv) incorrect and untimely recordkeeping of inventory movements of retail operation; and (v) incorrect diamond inventory costing, unrecorded purchases and unrecorded accounts payable.[165]

These disclosures lead me to believe that Fuqi had no *meaningful* controls in place. The board of directors may have had regular meetings, and an Audit Committee may have existed, but there does not seem to have been any regulation of the company's operations *in China*.[166] Nonetheless, even if I were to find that Fuqi had some system of internal controls in place, I may infer that the board's failure to monitor that system was a breach of fiduciary duty.

b. The Board of Directors Ignored Red Flags.

As the Supreme Court held in *Stone v. Ritter*, if the directors have implemented a system of controls, a finding of liability is predicated on the directors' having "consciously failed to monitor or oversee [the system's] operations thus disabling themselves from being informed of risks or problems requiring their attention."[167] One way that the plaintiff may plead such a conscious failure to monitor is to identify "red flags," obvious and problematic occurrences, that support an inference that the Fuqi directors knew that there were material weaknesses in Fuqi's internal controls and failed to correct such weaknesses. It is unclear how far back in time Fuqi's internal controls have been inadequate. At the very least, the Fuqi board had several "warnings" that all was not well with the internal controls as far back as March 2010.[168]

First, Fuqi was a preexisting Chinese company that gained access to the U.S. capital markets through the Reverse Merger. Thus, Fuqi's directors were aware that there may be challenges in bringing Fuqi's internal controls into harmony with the U.S. securities reporting systems.[169] Notwithstanding that fact, ac-

---

164. Compl. ¶ 43.

165. *Id.* ¶ 47.

166. Chancellor Strine recently suggested that U.S.-based directors of companies with substantial operations outside the U.S. cannot be "dummy directors"; that is, they must actively monitor the extraterritorial operations of the Delaware entity. *See Puda Coal*, 21:1–4. As the Chancellor noted, however, any analysis of liability under *Caremark* is a rigorous inquiry that will depend on the facts of the case. *See id.* at 18:21–24 ("[P]roportionality comes into play in assessing *Caremark* and the reasonableness of peoples' efforts at compliance because you can't watch everybody everywhere. You have to have a system.").

167. *Stone*, 911 A.2d at 370 (internal citations omitted).

168. In March 2010, Fuqi first disclosed the need for restatement of the 2009 financial statements.

169. To the extent that Fuqi argues that it is entitled to extra latitude because it is a Chinese company attempting to comply with American securities regulations, I reject that argument. Fuqi is a *Delaware* company that must accept both the benefits and the responsibilities associated with being organized under the laws of this State.

cording to the Complaint, the directors did nothing to ensure that its reporting mechanisms were accurate. Second, the board knew that it had problems with its accounting and inventory processes by March 2010 at the latest, because it announced that the 2009 financial statements would need restatement at that time. In the same press release, Fuqi also acknowledged the likelihood of material weaknesses in its internal controls. Third, Fuqi received a letter from NASDAQ in April 2010 warning Fuqi that it would face delisting if Fuqi did not bring its reporting requirements up to date with the SEC.

It seems reasonable to infer that, because of these "red flags," the directors knew that there were deficiencies in Fuqi's internal controls. Furthermore, NASDAQ's letter to Fuqi put the board on notice that these deficiencies risked serious adverse consequences. The directors acknowledged as much in their March 2010 press release.[170]

An analysis of the dates of Fuqi's disclosures demonstrates that it is reasonable, based on the facts pled, to infer that the directors knew that the internal controls were inadequate and failed to act in the face of a known duty. Fuqi announced to stockholders that it was restating its 2009 financial statements and investigating possible "material weaknesses" in its controls in March 2010. Rich sent the Demand Letter in July 2010, and the board appointed the Special Committee in October 2010. In March 2011, Fuqi announced that the cash transfer transactions had occurred between September 2009 and *November* 2010. These dates indicate that (1) Fuqi's directors knew that there were material weaknesses in Fuqi's internal controls *at the latest* in March of 2010; (2) Rich's

stockholder demand in July 2010 (as well as the myriad securities litigation suits filed) put the directors on notice that the stockholders would carefully scrutinize what was going on at Fuqi; (3) Fuqi had purportedly already begun to "act" on Rich's demand by November 2010; and (4) despite their knowledge of the weaknesses in Fuqi's internal controls, the directors allowed $130 million[171] in cash to be transferred out of the company, some as late as November 2010. The Plaintiffs have derived these facts directly from Fuqi's public disclosures. Facially, these disclosures are enough to allow me to reasonably infer scienter on the part of the Defendants.

That these cash transfers were not discovered until March of 2011, when Fuqi's auditor discovered them, reinforces the inference that the internal controls were (and possibly still are) grossly inadequate. That Chong was able to transfer $130 million out of the company's coffers, without the directors knowing about it for over a year, strains credulity. Either the directors knew about the cash transfers and were complicit, or they had zero controls in place and did not know about them. If the directors had even the barest framework of appropriate controls in place, they would have prevented the cash transfers.

When faced with knowledge that the company controls are inadequate, the directors must *act*, i.e., they must prevent further wrongdoing from occurring. A conscious failure to act, in the face of a known duty, is a breach of the duty of loyalty. At the very least, it is inferable that even if the Defendants were not complicit in these money transfers, they were aware of the pervasive, fundamental weaknesses in Fuqi's controls and knowingly failed to stop further problems from occur-

---

**170.** Compl. ¶¶ 40, 41 (acknowledging the likelihood of material weaknesses).

**171.** The sum of the amounts transferred in 2009 ($86.3 million) and 2010 ($47.5 million) equals approximately $130 million.

ring.[172] This knowing failure, as alleged by the Plaintiff, states a claim for breach of the duty of good faith under *Caremark.*

Finally, as then-Vice Chancellor Lamb explained in *David B. Shaev Profit Sharing Account v. Armstrong,* failing to establish an audit committee or failing to utilize an existing audit committee are examples of directors' "disabling themselves from being informed."[173] Fuqi management's failure to pay the fees of the Audit Committee's advisors is a deliberate failure to utilize the Audit Committee. Therefore, I may infer that the board has disabled itself from being informed.

For the reasons above, I find that the Plaintiff has stated a claim under *Caremark* upon which relief can be granted.

### C. Whether this Suit Should be Stayed.

The decision of whether to stay a case in favor of a first-filed action is discretionary. As a general rule, litigation should be confined to the state in which the first suit is filed. However, Delaware actions will not be stayed as a matter of right in favor of a prior-filed, out-of-state action.[174] Instead, the Court should "freely" exercise its discretion in favor of a stay where there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues.[175] In deciding this issue, the Court must be mindful of comity and the public policy behind one party's not being "permitted to defeat the [original] plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing."[176] These rules were articulated by the Delaware Supreme Court in *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.*[177] The Supreme Court noted that the policies driving the *McWane* factors were goals of avoiding inconsistent or contradictory judgments between courts, as well as avoiding an unseemly race to the courthouse.[178]

Here, Fuqi argues that this Court should stay or dismiss this suit in favor of cases that are consolidated and pending before the United States District Court for the Southern District of New York.[179] In particular, there are several securities actions and two derivative actions pending. In the alternative, Fuqi argues that "because Rich's Complaint essentially seeks indemnification, and is contingent on the resolution of the SEC investigation and restatement process, this Court should stay this case pending the outcome of those actions."[180]

### 1. A Stay in Favor of the Restatement Process or SEC Investigation is Not Appropriate at this Time.

I must deny the Defendants' request that this suit should be stayed until

---

172. *See AIG,* 965 A.2d at 799. At the very least, Chong, who authorized the payments, knew that the compliance systems were inadequate.

173. 2006 WL 391931, at *5 ("Concretely, this latter allegation might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet."); *Stone,* 911 A.2d at 370.

174. *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del.1970).

175. *Id.*

176. *Id.*

177. *Id.*

178. *Id.*

179. Defs.' Op. Br. 2.

180. *Id.*

audited financial statements are released or the SEC investigation is completed. Parts of the Plaintiff's claims may be contingent on the results of the SEC investigation; for example, some of the harm Fuqi has suffered may not be quantifiable at this time since the investigations are pending. However, that some of the harms are contingent in nature does not require that the adjudication of the Plaintiff's other claims be placed on hold, perhaps indefinitely, until the restatement process is finished. There are certainly circumstances where a stay would be appropriate where necessary evidence was forthcoming, and not yet available. Here, however, Fuqi has been unable to identify or even suggest when the restatement process will be complete. Four years have passed without the stockholders' receiving reliable audited financial statements. Just as it cannot indefinitely delay its obligation to hold an annual stockholders meeting,[181] Fuqi management cannot indefinitely delay facing appropriately brought derivative claims.

### 2. *This Court has the Discretion Not to Stay this Matter in Favor of the Federal Action.*

 McWane instructs me to freely exercise my discretion in favor of a stay where there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues.[182] I doubt that courts sitting in New York have personal jurisdiction over the Individual Defendants, many of whom are residents of China. Delaware has jurisdiction over each of the Individual Defendants because they are directors of a Delaware corporation. Because New York likely does not have jurisdiction over the Individual Defendants, I do not consider the courts in the Federal Action to be courts capable of doing prompt and complete justice in this matter.[183] As a result, I decline to stay this case.

## IV. CONCLUSION

Having found that the Plaintiff pled particularized facts that raise a reasonable doubt that the directors acted in good faith in failing to respond to the demand, I deny the Motion to Dismiss under Rule 23.1. Likewise, I deny the Defendants' Motion to Dismiss under Rule 12(b)(6) because the Plaintiff has pled facts that, when assumed true, lead me to reasonably infer that the Fuqi directors knew that its internal controls were deficient, and failed to correct such deficiencies. Finally, I deny the Defendants' Motion to Stay or Dismiss under *McWane*, as well, because I doubt that courts sitting in New York have personal jurisdiction over the Defendants. In summary, the Defendants' Motion to Dismiss or Stay this case is DENIED. An appropriate order accompanies this Opinion.

---

**181.** *See Rich v. Fuqi Int'l, Inc.*, 2012 WL 5392162, at *1 (Del.Ch. Nov.5, 2012).

**182.** *McWane*, 263 A.2d at 283.

**183.** *See id.*